IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 1:24-cr-00165 |
| | ) | |
| v. | ) | Sentencing Date: September 5, 2025 |
| | ) | |
| ABIMBOLA AJAYI, | ) | The Honorable Michael S. Nachmanoff |
| | ) | |
| Defendant. | ) | |

## POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

The Defendant Abimbola Ajayi repeatedly chose to steal thousands of dollars from a charity. For nearly four years, Ajayi lined her pockets with monies that were supposed to be used for programs to counter infectious diseases in disadvantage communities worldwide and provide disaster and humanitarian relief. The United States, in accordance with 18 U.S.C. § 3553(a) and the United States Sentencing Commission, Guidelines Manual ("Guidelines" or "U.S.S.G."), files this Position of the United States with Respect to Sentencing of defendant Abimbola Ajayi ("the defendant" or "Ajayi").

From September 2016 through at least May 2020, the defendant, along with her co-defendant Abiodun Ogunwale ("Ogunwale") brazenly stole at least $186,050 from Ogunwale's employer Project HOPE, a not-for-profit that provides global health programming and humanitarian aid. Considering the nature and complexity of the fraud, the defendant's role in the scheme, the impact on the victim, and in order to promote deterrence, the United States requests

1

the Court to sentence the defendant to a 30-month term of imprisonment and to a term of 3 years of supervised release.[1]

## I.    PROCEDURAL HISTORY

The defendant and Ogunwale were indicted on September 26, 2024. Dkt. 1. The five-count indictment charged both with conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349; conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); and two counts of wire fraud, in violation of 18 U.S.C. § 1343. *Id.* Ogunwale was charged with an additional count of mail fraud, in violation of 18 U.S.C. § 1341. *Id.* A superseding indictment was filed on February 5, 2025, that included the same charges but re-ordered the counts and slightly changed the factually allegations. Dkt. 62. After significant litigation over a number of issues, including a motion to sever, issuance of a Rule 17 subpoena, the defendants' need to call a particular witness potentially as an expert, and the defendants' request to travel, trial started on May 12, 2025 and lasted four days. On the first day of trial, the government moved to dismiss the two wire fraud counts, which the Court granted. Dkt. 153; 154. The jury convicted the defendants of the remaining counts. Sentencing was initially set for August 7, 2025, but was continued until September 5, 2025. Dkt. 195. The Final Pre-Sentence Report ("PSR") was filed on August 27. Dkt. 205.[2]

## II.    THE CRIMINAL CONDUCT

The Court is well aware of the facts of this case and presented a fulsome recitation of them in its Order denying the defendants a new trial ("Order"). Dkt 204. During trial, the government

---

[1] The government is submitting a separate motion as to restitution and forfeiture.

[2] For ease of referencing, when citing the PSR, the United States will note PSR, instead of dkt. 207. The PSR references the search warrant affidavit which was also filed during pre-trial litigation. Dkt. 45-1 at 35.

called ten witnesses, including current and former employees of Project HOPE, representatives from PayPal and the United States Post Office, and FBI Special Agent Clint Hemberg.

Ogunwale was employed by Project HOPE. PSR ¶ 9. In approximately December 2014, he became Project HOPE's Acting Director of Business Development. In approximately June 2015, he was promoted to the Director role. *Id.* In his position as Director, Ogunwale had the authority to select Project HOPE external consultants for the business development group, decide if they had the requisite skills needed, and would approve the hiring. Tr. Vol. 1 (ECF 179) at 156. *Id.* Indeed, in August 2016, he approved the hiring of Ajayi and later approved multiple contract extensions. *Id.* at 162; PSR ¶ 17. Mandy Luety ("Luety"), head of HR, testified as to how consultants/contractors were paid. As this court summarized in its Order:

> "After performing work, a contractor would 'submit [an invoice] either to HR directly or a combination of HR and the hiring manager or sometimes they'll send it directly only to the hiring manager.' Tr. Vol. 1 at 166:4-6. The hiring manager would then, after "confirming that work was completed," approve the invoice so that it could be paid. *Id*. at 166:11-12. Luety clarified that she did not review the contents of invoices for their accuracy but instead relied on hiring managers like Ogunwale. *Id*. at 174. She explained that Ajayi would send invoices as a contractor to Luety herself and Ogunwale by email, after which Ogunwale would usually quickly send a terse email approving those invoices."

Order at 8. During the trial, the United States presented fourteen consulting invoices submitted by Ajayi, approved by Ogunwale, and paid by Project HOPE. Ex. 100; 520-3.[3] However, this was just a portion of the Ajayi related fraud. Ajayi submitted twenty false consultant invoices, totaling $160,800, detailing consulting work that she claims to have completed. Ex. 1[4].

---

[3] The exhibits admitted at trial are attached as Exhibit A (trial exhibits). Within Exhibit A, the trial exhibits are separated by their exhibit number. This memorandum will cite the trial exhibits with their exhibit numbers, which include Ex. 10-2, 100, 300-2, 312-2, 313-2, 314-3, 315-3, 321-2, 512-1, 512-3 515-1, 516-1, 520-3, and 520-6.

[4] Exhibit 1 is full listing of the fraudulent Ajayi invoices being submitted for sentencing, the underlying invoices can be found in Exhibit 3. A similar summary exhibit was disclosed in the government's initial set

For all the Ajayi consultant invoices, both those presented at trial and now for sentencing, emails obtained from a search warrant of Ajayi's personal email account show that Ogunwale, from his personal email account, emailed Ajayi invoices to submit to Project HOPE. In turn, Ajayi would then email the invoices to Project HOPE for approval and payment. At trial, Agent Hemberg testified that all the invoices admitted originated from Ogunwale's personal Gmail account. Tr. Vol. 3 (ECF 177) at 121:5-12. FBI Special Agent Michael Beck reviewed the additional invoices and noted they followed the same pattern of originating from Ogunwale's personal email account. *See* Ex. 2; Ex. 3[5]. At trial, Agent Hemberg testified, and examples were shown, that Ogunwale would send Ajayi emails with the consultant invoice to be sent to Project HOPE attached, Ajayi then sent the same invoice to Project HOPE, often copying Ogunwale's business email address. Ogunwale would then approve the invoice. Tr. Vol. 3 at 129-157.

Luety testified that she always relied on the hiring manager to confirm that the work detailed in the consultant invoice is completed. Tr. Vol. 1 at 166. For Ajayi, Ogunwale as the hiring manage would have approved every invoice. *See id.* at 159, 166. Indeed, Luety testified to that point as to every Ajayi invoice presented at trial presented through exhibit 100. *Id.* at 168-171. Specifically, that she received his approval for each invoice presented. Ogunwale provided Ajayi with deliverables, such as a technical narrative and a "Compliance Matrix", that Ajayi then submitted to Project HOPE to make it appear like she performed legitimate work. PSR ¶ 18; Order at 13.

---

of trial exhibits, but the summary exhibit was later edited to account for the United States not presenting every invoice at trial.

[5] Exhibit 3 includes emails and invoices reviewed by Agent Beck, he also reviewed the electronic version of the files in the search warrant materials. These are marked with original trial exhibit sticker, but they were not ultimately presented during the case.

In addition to the emails and invoices Ogunwale sent to Ajayi, three witnesses— Steve Neri ("Neri"), Laura Brye ("Brye"), and Dr. Asefa ("Asefa") — testified at trial. They did not know Ajayi and should have known her based on the work purportedly done by her as detailed in her consultant invoices. Trial Tr. Vol. 2A (Dkt. 180) at 137-138; Trial Tr. Vol. 2B (Dkt. 176) at 19, 131-132, 134-143; Trial Tr. Vol. 3 (177) at 29-38, 40. Indeed for some of the invoices submitted, Brye and Asefa did the work claimed or Neri, Brye and/or Asefa explained who did the work or why a Project HOPE employee would have done the work. Trial Tr. Vol. 2B at 29-49, 134-143; Trial Tr. Vol. 3 at 29-38, 40. Neri, Brye and Asefa did not work with defendant Ajayi on the projects for which they had personal knowledge. *Id.* For the projects that had checklists, she was not listed on the checklists that corresponded to the submitted consultant invoices. Consultants were brought in for specific knowledge, often technical knowledge, that was needed for a specific project. Trial Tr. Vol. 2B at 15. They were also referred to as "subject matter experts." *Id.* at 131. The subject matters that defendant Ajayi purportedly worked on covered a diverse set of countries and work,[6] which did not make sense for one person to have the skills to do so. *See* Trial Tr. Vol. at 49-50. "Brye further testified that when she had been an outside consultant to Project HOPE, she wrote her own invoices and tracked her own hours/deliverables." Order at 11.

As to the additional invoices, Exhibit 1 details the invoice descriptions and amounts. Of note, they include claims that Ajayi:

---

[6] Specifically, she claimed to do work on HIV/AIDs (for which Project HOPE had in-house expertise and therefore did not need to hire a consultant), Malaria, Tuberculosis (TB), voluntary male circumcision (VMMC), and clean water (WRM-WASH), as well as a wide swath of countries/regions including Nigeria, Mozambique (Moz.), Ethiopia, Central Asia, Haiti, Ukraine, Namibia, South Africa, Bangladesh, Dominican Republic (DR) and Malawi.  Ex. 100; Trial Tr. Vol. 2B at 33-50.

- "Revised, formatted and provided edit [sic] to technical proposal….to Sustain and En-hance [sic] the Prevention, Care and Treat-ment [sic] of HIV/AIDS" Ex. 1; Ex 103-8.

- To draft three specific deliverables, including a matrix on "Prevention of Mosquito-Borne Diseases through Vector Control" and three draft responses "Advancing Progress in Malaria Service Delivery" Ex. 1; Ex 109-8.

- To draft and review "a design of Training Management Ecosystem and Capacity Building Efforts for ICDS Frontline Workers is more [sic] in line with Project HOPE's strategies for the health workforce" and gather intel on "USAID South Africa HIV Epidemic Control & Care and Treatment Services/SHESHA Care and Treatment"[7] Ex. 1; Ex 110-8.

- To develop a specific section for a South Africa proposal, and "Conducted final proposal review and edits for USAID South Africa OVC Component 1 Target Area 2 (Mpumalanga); Target Area 3 (KZN) and Component 2 (All 7 Provinces)"[8] Ex. 1; Ex 111-8.

- Completed various assignments related to USAID/PEPFAR[9] and "Global HIV/OHA Bids, including drafting a "Management Approach" Ex. 1; Ex 115-8.

- Completed various assignments related to USAID Bangladesh TB including "[d]eveloped the pre-proposal literature" Ex. 1; Ex 116-8.

In addition to submitting false consultant invoices, Ogunwale and Ajayi devised another means to embezzle funds. Separate from the fraudulent consultant invoices, the two embezzled funds through expense reports for which PayPal receipts were submitted. Ex. 300-2, 312-3; 313-2; 314-3; 315-3; 321-2. As presented at trial, Ogunwale used the expense reimbursement process by paying for purported Project HOPE expenses via PayPal that was linked to a Project HOPE

---

[7] Again, Neri explained that they had in house expertise on HIV/AIDS, and different regions on the continent had different needs. Trial Tr. Vol. 2B at 38-39.

[8] Mpumalanga is a province in South Africa and KZN is the common abbreviation for the province of KwaZulu-Natal also in South Africa.

[9] PEPFAR is an abbreviation for the U.S. President's Emergency Plan for AIDS Relief related to the global HIV/AIDS pandemic. https://www.state.gov/pepfar/ last accessed 8/28/2025.

American Express credit card ("PH Amex card") that was assigned to one of the employees he supervised, Anthony Tredon ("Tredon"). Tredon testified that he gave his PH Amex card number to Ogunwale at Ogunwale's request. Tr. Vol. 2A at 63-64. The PH Amex card was linked to a PayPal account (X8450) by which payments were made via PayPal and the funds were drawn from the PH Amex card ending in X1006. *See* Ex. 516-1. The X8450 PayPal account listed Tredon's name as the registered user, but the email account listed on the account was Ogunwale's personal email account and Ogunwale's personal phone number was also listed. Ex. 516-1. Tredon also testified that he would have used his own email account if setting up a PayPal account, not Ogunwale's personal email account. Tr. Vol. 2A at 66-68. Further, he did not remember setting up the X8450 PayPal Account. *Id.*

At trial, the government presented evidence of five false receipts (totaling $25,250) that were used to substantiate fraudulent expenses paid using Project HOPE funds via PayPal and the linked PH Amex card. Ex. 300-2; 312-3; 313-2; 314-3; 315-3; 321-2; 520-3. Ajayi received the funds into PayPal account X7592 registered in her name, for the business AbbiFabDynamics, LLC, which she incorporated in Georgia. Ex. 300-2; 512-1; Trial Tr. Vol. 3 at 103. However, of note, the expense reimbursements and the receipts used to justify the expense reimbursements listed "FEDMARKET DYNAMICS" and "AFAB Dynamics Consult," not her name or the full name of her company[10]. Ex. 300-2. Furthermore, PayPal provided the invoices created through the AbbiFabDynamics account, ex. 512-3, and while the amounts matched the receipts that were submitted to Project HOPE, the descriptions on the submitted receipts were often changed and

---

[10] The underlying receipts did include the statement "the transaction will appear on your statement as PayPal * PAYPAL *ABBIFABDYNA", but the "Merchant Details" listed FEDMARKET DYNAMICS" or "AFAB Dynamics Consult". 312-3; 313-2; 314-3; 315-3; 321-2.

there was no reference to bill to "oa\*\*\*@gmail" as listed on the PayPal provided invoices. *Compare* Ex. 512-3 to 312-3; 313-2; 314-3; 315-3; 321-2.

Multiple witnesses testified that consultants should not be paid through expense reports. Trial Tr. Vol. 1 at 212, 230; Tr. Vol. 2B at 58. As to the receipts submitted through the expense reimbursements for which Ajayi received the funds, Neri testified that he did not understand the need to purchase the outlines and matrixes for the amounts charged. Ex. 300-2; Tr. Vol. 2B at 61. Asefa also testified that Project HOPE was a financially struggling organization during the time of the criminal conduct. Trial Tr. Vol. 3 at 72.

Ajayi would kickback a portion of the Project HOPE funds she received (both from the consultant invoices and those paid via expense reimbursements) to Ogunwale. Specifically, during trial, the government presented that Ajayi kickbacked at least $62,180 to Ogunwale from the Project HOPE funds she received. Ex 520-6. Specifically, she transferred funds to him by wiring funds from her account in Nigeria, paying his credit card and withdrawing funds in cash and depositing them in his account or the Compass account. Order at 14, Tr. Vol. 3 at 200-211; Ex 520-6. Ogunwale took steps to hide his ownership of Compass. Specifically, he changed the corporation papers with Virginia Corporation Commission from listing his name to his wife's name as the registered agent. Tr. Vol. 3 at 99.

## III. THE APPROPRIATE GUIDELINES RANGE

As this Court is aware, following the Supreme Court's decision in *United States v. Booker*, the Sentencing Guidelines are now advisory. 543 U.S. 220, 264 (2005). "In the wake of *Booker* . . . the discretion of sentencing court is no longer bound by the range prescribed by the guidelines. Nevertheless, a sentencing court is still required to 'consult [the] Guidelines and take

them into account when sentencing.'" *United States v. Hughes,* 401 F.3d 540, 546 (4th Cir. 2005) (quoting *Booker,* 543 U.S. at 264). In fact, the Fourth Circuit noted that "a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines." *United States v. Hughes,* 401 F.3d 540, 546 (4th Cir. 2005). Thus, "sentencing courts are not left with unguided and unbounded sentencing discretion." *United States v. Green,* 436 F.3d 449, 455 (4th Cir. 2006).

In making factual findings at sentencing proceedings, the Court should use the preponderance of the evidence standard. *United States v. Harris*, 882 F.2d. 902, 907 (4th Cir. 1989); *United States v. Bolden*, 325 F.3d 471, 503 (4th Cir. 2003).

### A. *The Guidelines Calculation*

The Probation has calculated the Guidelines, PSR ¶¶ 62-71, as follows:

| | |
|---|---|
| Base Offense (U.S.S.G. §2S1.1(a)(1) & §2B1.1(a)(1)) | 7 |
| Loss greater than $150,000 (U.S.S.G. §2B1.1(b)(1)(F)) | +10 |
| Conviction under 18 U.S.C. § 1956 (§2S1.1(b)(2)(B)) | +2 |
| <u>Zero Point Offender ((§4C1.1(a) and (b))</u> | <u>-2</u> |
| **Total Offense Level** | **17** |

A Total Offense Level of 17, with a criminal history category I, corresponds to a custodial sentence of 24 to 30 months.

The United States submits that an additional enhancement, sophisticated means, should be applied pursuant to U.S.S.G. §2B1.1(b)(10)(C), resulting in a Total Offense Level of 19.[11] This offense level, with a criminal history category I, corresponds to a custodial sentence of 30 to 37

---

[11] The United States did not file their objection with Probation regarding the sophisticated means enhancement until after the final PSR was issued. Defense counsel was notified of the government's intent to seek the enhancement on August 27, 2025.

months.

### B. Relevant Conduct was Properly Included

Relevant conduct is defined by U.S.S.G. § 1B1.3(a)(1) and includes,

"(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were-- (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity."

Further, it is to include "all harm that resulted from the acts and omissions … and all harm that was the object of such acts and omissions." U.S.S.G. § 1B1.3(a)(3). In calculating the fraud loss, the court must apply the principles of relevant conduct as outlined by U.S.S.G. § 1B1.3. *Bolden*, 325 F.3d at 498. The court should look to the conduct that the defendant agreed to jointly undertake. *Id.* at 499. Here, that is conduct of submitting false consulting invoices and expense reimbursements (including false receipts submitted in support of the amounts) to Project HOPE for which Ajayi would be paid.

The full loss, including relevant conduct, is $186,050. PSR ¶ 43; Ex.4.[12] Of note, the United States is not seeking Ajayi to be held responsible for loss related to other "consultants" such as Damilola Adeoye, or for other amounts embezzled by Ogunwale. This is in line with the Guidelines and case law, as such losses may not have been "reasonably foreseeable." *Bolden*, 325 F.3d at 498.

At trial the government proved the loss related to Ajayi's and Ogunwale's mail and wire fraud conspiracy conduct to be $141,350. Ex. 520-3 and 300-2. This loss included fourteen

---

[12] Ex. 4 summarizes the accounts for which Ajayi received the Project HOPE Funds.

consultant invoices (totaling $116,100) and the receipts submitted through Project HOPE's expense reimbursement process (totaling $25,250). *Id.* For sentencing, the additional loss is related to additional Ajayi consultant invoices that while marked as exhibits were not introduced at trial. Specifically, six additional consultant invoices are being included. *See* Ex. 1. As detailed in FBI Special Agent Michael Beck's declaration, these invoices were all found in the search warrant executed on Ms. Ajayi's email account and were provided by Ogunwale from his personal Gmail account to Ajayi, and then Ajayi forwarded them to Project HOPE for payment. Ex. 2, *See* Ex. 3.[13] As explained during trial, Ogunwale as the hiring manager had to approve the invoices for them to be paid. The total loss, including relevant conduct, is as follows:

| | | |
|---|---|---|
| Loss Associated with All Fraudulent Ajayi Consultant Invoices | $160,800.00 | Ex 1; Ex. 4 |
| Loss Associated with Ajayi Expense Reimbursements[14] | $25,250.00 | Ex. 300-2; 520-3; Ex. 4. |
| **Total Loss** | **$186,050.00** | Ex. 4[15] |

The defense claims that because these additional consultant invoices were not presented at trial, they cannot be used for sentencing. This is simply contrary to the law. The additional consultant invoices claim that Ajayi completed specific work for Project HOPE. The evidence produced at trial proves that she was not known by Neri, Brye, or Asefa. Additionally, these invoices also follow the same pattern as those proved at trial. Ogunwale sent invoices to Ajayi,

---

[13] Exhibit 3 includes the emails and attached invoices marked as exhibits for trial, but not admitted as the Government streamlined its case. Those include 103-1, 103-2, 103-4, 103-5, 103-8, 109-1, 109-4, 109-5, 109-8, 110-1, 110-2, 110-4, 110-5, 110-8, 111-1, 111-2, 111-4, 111-5, 111-8, 115-1, 115-2, 115-4, 115-5, 115-8, 116-1, 116-2, 116-4, 116-5, 116-8. The numbering sequence follows the same pattern as those presented at trial and include those found in the search warrant and those produced by Project HOPE that were paid. For example, the 103 series relate to the same invoice, from the various sources. Exhibit 1 also includes the initial exhibit number assigned.

[14] All of these expense reimbursements were presented at trial.

[15] Exhibit 4 summarizes the payments for all the fraudulent invoices and expense reimbursements. It was provided as an initial trial exhibit but was edited to account for the six Ajayi invoices not presented at trial.

who in turned submitted them for payment as if she had done the work. Finally, the additional invoices claim that Ajayi completed work related to HIV and AIDS (for which Neri testified that they had significant in-house experience), Malaria, TB, and covered multiple regions in South Africa as well as Bangladesh. Consultants were hired for their technical knowledge regarding diseases and regions. Ms. Ajayi, who lacks a public health degree, medical degree, or master's degree in a hard science, lacked the knowledge to provide expertise on far ranging topics in a diverse range of countries.

The Defense claims that Ajayi should get a reduction for the sums transferred to Ogunwale. This is also counter to the Guidelines. The Application notes define "Actual Loss" as the "pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, cmt. n. 3(A)(i). The gain to the defendant is only used as "an alternative measurement of loss only if there is a loss but it reasonable cannot be determined." *Id.* cmt. n. 3(B). As such, Ajayi's argument fails as the pecuniary harm to Project HOPE has been determined.

### C. The Defendant is Not Entitled Minor Role in the Offense

The defendant claims that she is entitled to a minor role adjustment that would result in the reduction of two points. PSR at 27. To qualify for the enhancement, the defendant has the burden of showing that the adjustment applies. *United States v. Akinkoye*, 185 F.3d 192, 202 (4th Cir. 1999). The adjustment applies only to a defendant whose part in the offense "makes him substantially less culpable than the average participant." U.S.S.G. § 2B1.1, cmt. n. 3(A). In making this determination the court examines whether "the defendant's conduct relative to the other defendants, but also ... his or her conduct relative to the elements of conviction." *United States v. Blake*, 571 F.3d 331, 352 (4th Cir. 2009) (quoting *Akinkoye* at 202). And, importantly,

that analysis includes "whether the defendant's conduct is material or essential to committing the offense." *Id.* (cleaned up). Indeed, "[t]he critical inquiry for a sentencing court, in considering a § 3B1.2 adjustment, is not just whether the defendant has done fewer bad acts than [her] codefendants, but whether the defendant's conduct is material or essential to committing the offense." *United States v. Powell*, 680 F.3d 350, 359 (4th Cir. 2012) (cleaned up). "This fact-based determination is based on 'the totality of the circumstances,' and the Guidelines identify five relevant factors: 'the defendant's understanding of the criminal activity, the defendant's role in planning it, the degree to which the defendant made decisions, the extent of the defendant's participation, and the benefit the defendant stood to gain.'" *United States v. Lawson*, 128 F.4th 243, 252 (4th Cir. February 7, 2025) (quoting *United States v. Guerrero-Deleon*, 713 F. App'x 163, 165 (4th Cir. 2017) (citing U.S.S.G. § 3B1.2 cmt. 3(C))).

        Here, while Ogunwale had significant culpability by being a critical insider at Project HOPE, the fraud could not have been completed, let alone successfully, without Ajayi. Importantly, she submitted the consultant invoices to Project HOPE via email. She received the fraud proceeds prior to kicking funds back to Ogunwale. In doing so, she laundered the funds through structured cash withdrawals that were then used to deposit cash into Ogunwale's bank accounts. She also laundered funds by paying Ogunwale's credit card directly. In essence, she managed the fraud proceeds in the first instance. And her PayPal account, held in her company's name, was used to conceal funds paid through Project HOPE expense reimbursements. Ajayi again then kicked money back to Ogunwale. Without her fraudulent conduct, the underlying conduct in both the fraud and money laundering conspiracies would not have occurred. The defendant understood the role that she played in the scheme and actively participated in it. It is

unclear how much role she played in planning the scheme or to the extent she made decisions. But what is clear, is she received a significant financial benefit. The defendant has not met her burden to receive this adjustment.

### D. The Sophisticated Means Enhancement Should be Applied

Ajayi and Ogunwale ran a sophisticated scheme. As such, the Probation Officer should have applied a two-level enhancement under § 2B1.1(b)(10)(C), which reads "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, increase by **2** levels." "'Sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution **or** concealment of an offense… Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." U.S.S.G. § 2B1.1 cmt. n. 9(B) (emphasis added).

The plain language of the definition of sophisticated means supports that a finding may be based on either the execution <u>or</u> the concealment of the offense. The Fourth Circuit has found that the "enhancement applies where the entirety of the scheme constitutes sophisticated means, even if every individual action is not sophisticated." *United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014) (bank fraud). The focus is on the execution of the scheme, which must separate the offense "from the ordinary or generic." *United States v. Jimwright*, 683 F.3d 471, 486 (4th Cir. 2012) (tax offense). For example, the *Adepoju* court noted that nearly all bank fraud schemes include misrepresentations and the use of another individual's information; as such, additional "complexities and intricacies" are required for the enhancement in a bank fraud scheme. 756 F.3d at 258. The Fourth Circuit later expounded on this noting, "[A]n enhancement can only be applied

14

when there is proof of complexity beyond the 'minimum conduct required to establish [fraud] in its simplest form.'" *United States v. Savage*, 885 F.3d 212, 228 (4th Cir. 2018) (quoting Adepoju, 756 F.3d at 257). However, the clumsy execution of a scheme, should not be considered, instead the court should look to "'especially complex or especially intricate' planning involved in the fraud." *United States v. White*, 850 F.3d 667, 676 (4th Cir. 2017) (tax fraud). Additionally, a defendant need not use "the most complex means possible to conceal his fraudulent activities in order for the court to find that he used sophisticated means." *Jimwright*, 683 F.3d at 486 (internal citations omitted). In sum, the Fourth Circuit has required that the sentencing court "consider the cumulative impact of the criminal conduct, for the total scheme may be sophisticated when all the steps are linked together." *Jimwright*, 683 F.3d at 486 (internal citations omitted).

Recently, the Fourth Circuit found sophisticated means based upon in part an extended length of time as well as the changing methodology of the scheme, including using a variation of names when bidding on federal contracts with various government entities. *United States v. Sanders*, 2025 WL 2078201, *5 (July 24, 2025). The court also cited the use of various usernames and addresses, which would make it difficult to route the fraud back to the defendant. *Id.*

Here, the totality of the scheme demonstrates that the sophisticated means enhancement is warranted. The scheme occurred over an extended period, over nearly four years. The entire premise of the conspiracy was for Project HOPE to not know that Ogunwale was receiving funds and committing the fraud. To hide his involvement, he first had Ajayi "hired" as a consultant. This involved him approving her contract and the extensions, for which she willingly participated by submitting her personal information, her preferred consultant payment method, and her resume. Her submitted resume detailed her supposed public health experience specifically noting

15

experience in PEPFAR programming and international aid experience. Ex. 10-2. He then sent invoices to Ajayi from his personal email account, not his business email account. The consultant invoice portion of the fraud was also incredibly intricate. Indeed, a review of the consultant invoices on their face, without someone having additional information (such as the business development employees), was incredibly detailed and specific (as each invoice was unique in its description) and made the fraud difficult to detect from first blush. She submitted the invoices, willingly. She also followed up with Luety when needing to change her payment method and to confirm mail being sent. This was part of a carefully executed scheme that she was necessary to complete. Ajayi sent a few deliverables, which she had really obtained from Ogunwale, to make it appear as if she had done some work. Again, an intricate design of the scheme.

They also changed their methodology of embezzling from only using consultant invoices, to using both consultant invoices and the expense reimbursement process. Specifically, the first fraudulent consultant invoice was paid in September 2016 and then in October 2018 the first expense reimbursement was paid. Ex. 4. The scheme lasted through at least May 2020. The expense reimbursement means of the scheme involved even more steps to conceal and added complexity to the scheme itself. Specifically, the PayPal receipts did not list Ajayi by name, as that would run the risk of someone at Project HOPE recognizing that she was a consultant. Instead, the invoices listed other names, including FedmarketDynamics and AFAB Dynamics. These names do not appear to be even close her name — Abimbola Ajayi. Additionally, the use of PayPal was meant to conceal the scheme. As it added a layer in the payment process.

Ajayi kicked funds back to Ogunwale in a manner to conceal the true nature of the funds, and therefore the crime. It was part of the fraud scheme for him to receive the funds, otherwise

16

why commit it. She could have easily wired him money, making it traceable. Instead, she mainly withdrew funds in cash and then deposited the funds into an account he controlled (including a Compass account) and made payments to pay his credit card. Notably, another Fourth Circuit case has applied the sophisticated means enhancement when a defendant went to extra lengths to disguise his kickback payments. *See United States v. Wolf*, 860 F.3d 175, 199 (4th Cir. 2017) ("Here, there was sufficient evidence for the district court to conclude that Wolf used a means of concealment that went beyond the concealment inherent in bank fraud. Wolf disguised the kickbacks to the straw buyers as payments to companies for work done on the property.")

A straightforward embezzlement case often includes changing the bank account of a legitimate vendor to that of the insider. But here, a series of steps were taken over a prolonged period, involving two means of embezzling funds, her using FedmarketDynamics and AFAB Dynamics on the receipts, and using PayPal to hide who was receiving the funds. The facts here actually meet both prongs of the sophisticated means enhancement — (1) complex or especially intricate offense conduct pertaining to the execution **AND** (2) concealment of the offense. Indeed, the conduct here took intricate planning in which when all the steps of the scheme are linked together the total scheme is considered sophisticated.

## IV.  THE FACTORS SET FORTH IN § 3553(A) AND RECOMMENDED SENTENCE

After calculating the appropriate guidelines range, "the court must 'determine whether a sentence within that range . . . serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors." *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006) (quoting Green, 436 F.3d at 455). Those factors include the nature and circumstances of the offenses, the history and characteristics of the defendant, and the need for the

sentence to reflect the seriousness of the offense, to promote respect for the law, to promote just punishment, to afford deterrence, protect the public, provide the defendant with needed educational or other training, to avoid unwarranted sentence disparities and the need to provide restitution. 18 U.S.C. § 3553(a). The Court need not weigh the factors equally but must consider each of them. *United States v. Fowler*, 948 F.3d 663, 674 (4th Cir. 2020).

The defendant participated in two complex conspiracies for over three years. She made a sizable profit from these criminal activities, personally pocketing over $120,000 in ill-gotten gains. The scheme was not the result of a single bad decision from the defendant. Instead, she chose to submit fraudulent invoices to Project HOPE again and again, choosing to break the law numerous times through an extended period of time. Moreover, Ajayi was not content to simply submit the twenty false invoices to Project HOPE that fraudulently billed the charity. She also submitted five false expense reports to Project HOPE that fraudulently billed the charity for services and goods she falsely claimed her company provided. The defendant also worked to ensure that a portion of the fraud proceeds were funneled back to Ogunwale.

The defendant's prolonged participation in the fraud and money laundering conspiracies combined with her extensive involvement in both schemes show that there is a need for a serious custodial sentence in this case. This was not a scheme that came to fruition overnight. Instead, it was a complex orchestrated scheme that took foresight, planning, and communication between the conspirators. In fashioning an appropriate sentence, the Court should consider the length and complexity of the defendant's fraudulent activities and the fact that she took advantage of a charity to enrich herself through fraud. *See Gall*, 522 U.S. at 59 (holding it was "quite reasonabl[e]" for the sentencing for the sentencing court to have "attached great weight" to a 3553(a) factor.); *see*

18

*also Kimbrough v. United States*, 552 U.S. 85, 111 (2007) (holding that appellate court should not find the sentencing court's reliance on a single factor unreasonable, so long as the court imposes a sentence sufficient, but not greater than necessary to accomplish the sentencing goals advanced in § 3553(a)(2)") (internal quotation marks omitted*); see also United States v. Pauley*, 511 F.3d 468, 476 (4th Cir. 2007) (permitting a district court to "reasonably accord significant weight to a single sentencing factor in fashioning its sentence.")

There appears to be no reason for the defendant to have committed this crime, except for greed. As the PSR details, the defendant currently earns a "healthy income" and appeared to have several sources of income during the fraud and laundering schemes. PSR at ¶ 120. Moreover, the defendant not only had the benefit a bachelor's degree but has also obtained a graduate degree, specifically an MBA from DeVry University. Thus, the defendant not only had the educational and work background to find steady employment she also had steady employment throughout the duration of the conspiracies and even owns a Mercedes-Benz. See PSR at ¶ 114. There was simply no need for the defendant to commit the fraud or money laundering crimes. Similarly, the victim has expressed no remorse for her criminal conduct, or its effects on the victim, Project HOPE. Thus, the defendant's greed, lack of acceptance of responsibility, and having no remorse justifies a Guidelines sentence of incarceration.

The defendant's crimes also had a real impact on the victim in this case, Project HOPE. This detrimental impact should be considered when fashioning the defendant's sentence. As Dr. Asefa testified, Project HOPE was not an organization in sound financial health during the pendency of the fraud and laundering schemes. Naturally, the defendant and her coconspirator's conduct, contributed to Project HOPE's fiscal deterioration and a significant impact on the

organization. As Project HOPE's general counsel explained, the monies "stolen by Mr. Ogunwale and Ms. Ajayi had a real, tangible impact on Project HOPE's efforts to develop new humanitarian aid programs, secure funding sources and grants, and provide lifesaving services to vulnerable populations." Project HOPE's general counsel then pointed to how the monies stolen by the defendants certainly could have been put to better use by the organization by providing medical supplies, supporting deliveries of pregnant patients, or assisting with antenatal consultations, and providing medical care to those in war zones. Dkt. 205 at ¶¶ 44-49. In short, the seriousness of the defendant's offenses and the harm suffered by the victim in this case, cannot be overstated.

A meaningful prison sentence is also necessary to generally deter others tempted to commit similar crimes. "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation marks and citation omitted); United States v. Hayes, 762 F.3d 1300, 1308 (11th Cir. 2012) ("[G]eneral deterrence is an important factor in white-collar cases, where the motivation is greed."). Absent a serious term of imprisonment, general deterrence — "the effort to discourage similar wrongdoing by others through a reminder that the law's warnings are real, and that the grim consequence of imprisonment is likely to follow"—will not be achieved. United States v. Bergman, 416 F. Supp. 496, 499 (S.D.N.Y. 1976). General deterrence from white-collar crimes is particular meaningful in the context of this case, as non-profits like Project HOPE, generally do not have the resources or the abilities to detect these crimes until it is too late. See United States v. Morgan, 635 F. App'x. 423, 450 (10th Cir. 2015) ("General deterrence comes from a probability of conviction and significant consequences. If either is eliminated or minimized, the deterrent

20

effect is proportionally minimized.").

Congress recognized that general deterrence is particularly important in the context of white-collar crime and "emphasized the critical deterrent value of imprisoning serious white-collar criminals, even when the criminals might be unlikely to commit another offense." *United States v. Sample*, 901 F.3d 1196, 1200 (10th Cir. 2018); *see also United States v. Livesay*, 587 F.3d 1274, 1279 (11th Cir. 2009) (cleaned up) ("[I]n enacting § 3553, Congress was especially concerned that prior to the Sentencing Guidelines, major white-collar criminal often were sentence to small fines and little or no imprisonment.")

Also, given the defendant's lack of remorse for her brazen crimes, there is a true concern of recidivism in this case. If she is not appropriately punished, she will think that there are no consequences to her significant criminal conduct. A meaningful term of imprisonment is necessary to specifically deter her from committing fraud in the future. In sum, a significant period of incarceration will reflect the seriousness of the defendant's offense, promote respect for the law, deter future criminal conduct, protect the public from future harm and provide a just punishment.

## CONCLUSION

For the reasons stated, the United States respectfully requests this court to sentence Abimbola Ajayi to a period of incarceration 30 months and to 3 years of supervised release. Such a sentence is reasonable and accounts the for the factors set forth in 18 U.S.C. § 3553(a).

Erik S. Siebert
United States Attorney


_____/s/_____
Kimberly M. Shartar
Kathleen E. Robeson
Assistant United States Attorneys
2100 Jamieson Avenue

Alexandria, VA 22314
(703) 299-3700

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 29, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of that electronic filing (NEF) to all counsel of record:

By:  _____/s/_____
Kimberly Shartar
Assistant United States Attorney
United States Attorney's Office
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: 703-299-3700
Email: kimberly.m.shartar@usdoj.gov